IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LORNA CLAYCOMB,

          Plaintiff,

   v.

PLAYTEX PRODUCTS, INC.,

          Defendant.

C.A. No. 06-120 (JFF)

**PLAYTEX PRODUCTS, INC.'S OPENING BRIEF**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
    Attorneys for Defendant

January 12, 2007

<u>TABLE OF CONTENTS</u>

<u>Page</u>

NATURE AND STAGE OF THE PROCEEDING..........................................................................1

FACTUAL BACKGROUND ...............................................................................................3

ARGUMENT ..................................................................................................................8

    I.      SUMMARY JUDGMENT STANDARD OF REVIEW.........................................8

    II.    DSPC IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH (AND CANNOT ESTABLISH) A *PRIMA FACIE* CASE OF DISCRIMINATION........................10

    III.   ALTERNATIVELY, PLAYTEX IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF HAS FAILED TO OFFER (AND CANNOT OFFER) ANY EVIDENCE SHOWING THAT PLAYTEX'S NON-DISCRIMINATORY REASONS FOR ITS ACTIONS ARE A PRETEXT FOR DISCRIMINATION....................12

CONCLUSION................................................................................................................14

ii.

## TABLE OF CITATIONS

Page(s)

Cases

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)               6

Bragdon v. Abbott,
    524 U.S. 624 (1998)               8

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)               6

Deane v. Pocono Med. Ctr.,
    142 F.3d 138 (3d Cir. 1998)     8

Janil v. Avdeo Corp.,
    873 F.2d Supp. 101 (3rd. Cir. 1989)     7

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)     6, 7

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)     7, 10, 11, 12

Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,
    998 F.2d 947 (3d Cir. 1993)     6

Revis v. Slocomb Indus.,
    814 F. Supp. 1209 (D. Del. 1993)     7

Sarullo v. United States Postal Serv.,
    352 F.3d 789 (3d Cir. 2003)     11

Sutton v. United Air Lines,
    527 U.S. 471 (1999)     8

Toyota Motor Manufacturing , Kentucky, Inc. v. Williams,,
    534 U.S. 184 (2002)     9

Walker v. Pepsi-Cola Bottling Co.,
    2000 WL 1251906 (D. Del. Aug. 10, 2000)     10

iii.

Other Authorities

29 CFR § 1630                                                      9

42 U.S.C. § 12101                                                  8

42 U.S.C. § 12102                                                  8

*What Constitutes Substantial Limitation on Major Life Activity of
    Breathing For Puposes of Americans With Disabilities Act,*
    194 A.L.R. 455                                                 10

## NATURE AND STAGE OF THE PROCEEDING

This is an action in which Lorna Claycomb ("Plaintiff"), claims that Playtex Products, Inc. ("Playtex") discriminated against her based on her alleged disability – asthma. Specifically, Plaintiff claims that Playtex failed to accommodate her with a job that would not have aggravated her alleged asthmatic condition, and then ultimately terminated her when she refused to perform assignments that she believed would have exposed her to cotton fibers, which she believed would have resulted in an asthma attack. See Complaint (D.I. 1) and Charge of Discrimination, dated January 19, 2005 (see Appendix To Playtex Products, Inc.'s Opening Brief In Support Of Its Motion For Summary Judgment, at A 1-3) (hereinafter, citations to be made as "App., at A __"). Playtex denied those claims in its Answer (D.I. 4).

The discovery period provided for in the Rule 16 Scheduling Order (D.I. 10) has expired and this is Playtex's opening brief in support of its motion for summary judgment.

## SUMMARY OF THE ARGUMENTS

First Argument:  DSPC is entitled to summary judgment because plaintiff has failed to establish (and cannot establish) a *prima facie* case of discrimination. Specifically, Plaintiff has failed to establish that she is "disabled" for the purposes of the Americans With Disabilities Act.

Second Argument:  Alternatively, Playtex is entitled to summary judgment because plaintiff has failed to offer (and cannot offer) any evidence showing that Playtex's non-discriminatory reasons for its actions are a pretext for discrimination. Therefore, Plaintiff cannot satisfy her burden under the McDonnell Douglas standard.

## FACTUAL BACKGROUND

Playtex is one of our country's leading, diversified manufacturers of feminine care, sun and skin care, and infant care products.[1]  Bollinger Aff., at ¶ 2. Among other things, Playtex manufactures a variety of tampon products, including the Gentle Glide, Sport and Beyond product lines, breastfeeding systems, nurser systems, baby bottles, pacifiers, Banana Boat skin protection products, Wet Ones antibacterial wipes, and a variety of latex gloves.  Id.  Within the State of Delware, Playtex's state of incorporation, Playtex operates a manufacturing plant in Dover (the "Dover Plant").  Id., at ¶ 3.  At the Dover Plant, Playtex manufactures, packages and distributes Gentle Glide, Sport and Beyond tampons, Drop-ins bottle liners, and packages and distributes a variety of infant care products, including: bottles, cups, nipples and liners.  Id.

Playtex strives to have a flexible, well-trained workforce at the Dover Plant because its diverse operations there involve a wide variety of tasks.  Id., at ¶ 4. Examples of available jobs include: machine operator, material handler, packager, line inspector and quality control inspector.  Id.  Employees are assigned jobs through a "bidding" system.  Id.  Available jobs are posted and employees "bid" for the jobs in which they are interested.  Jobs are assigned based on seniority.  Id.

Occasionally, jobs are eliminated based on operational needs of the company.  Id., at ¶ 5.  When an employee's assigned job is eliminated, she can bid on any available job, accept a temporary assignment (short-term versions of the various job

---

[1]     Each of the facts contained in this section are set forth in the Affidavit Of James Bollinger, which is being filed in support of this brief (hereinafter, citations to be made as "Bollinger Aff., at ¶ __").

4.

assignments that occasionally become available based on Playtex's production needs), or accept a voluntary layoff.  Id.

Plaintiff began working at the Dover Plant on October 20, 2000.  Id., at ¶ 6.  During her time at the Dover Plant, Plaintiff performed the following jobs and temporary assignments:

| Date | Job | Division |
|------|-----|----------|
| 10/20/00 – 2/19/01 | Machine Operator | Silk Glide |
| 2/20/01 – 3/11/01 | Machine Operator | Gentle Glide |
| 3/12/01 – 4/29/01 | Inspector/Packer (temp.) | Gentle Glide |
| 4/30/01 – 7/29/01 | Machine Operator (temp.) | Gentle Glide |
| 7/30/01 – 9/30/01 | Machine Operator | Silk Glide |
| 10/1/01 – 4/18/02 | Machine Operator | Silk Glide |
| 4/19/02 – 2/2/03 | Quality Control Inspector | Gentle Glide |
| 2/3/03 – 3/31/03 | Inspector/Packer | Gentle Glide |
| 4/1/03 – 5/8/03 | Inspector/Packer | Gentle Glide |
| 5/9/03 – 4/18/04 | Quality Control Inspector | Silk Glide |
| 4/19/04 – 5/13/04 | Quality Control Inspector (temp.) | Gentle Glide |
| 5/14/04 – 8/30/04 | Quality Control Inspector (temp.) | Gentle Glide |
| 8/31/04 – 9/30/04 | Packager (temp.) | Drop-ins |
| 10/1/04 – 12/26/04 | Packager (temp.) | Drop-ins |
| 12/27/04 – 01/03/05 | Line Inspector (temp.) | Cherubs (pacifiers). |

Id.

As indicated above, from her hire date through December 2004, Plaintiff performed many of the different jobs available at the Dover Plant. On December 23, 2004, Playtex informed Plaintiff that her temporary assignment as a Packager in Drop-ins ended and she would be transferred to a temporary assignment as a Line Inspector in the Cherubs division (which is the division that manufacturers baby pacifiers). Id., at ¶ 7. In that position, Plaintiff would inspect pacifiers on the assembly line and assemble pacifier boxes. Id. Plaintiff immediately expressed displeasure with the temporary assignment and demanded a Quality Control Inspector job.[2] Id. When Playtex informed Plaintiff that she could not pick a job based on her personal preference, she begrudgingly agreed to try the new temporary assignment. Id.

On December 27, 2004, Plaintiff began her Line Inspector assignment in the Cherubs division. Id., at ¶ 8. One week later, on January 3, 2005, Plaintiff informed her supervisor that she believed she was physically unable to perform her assignment. Id. Plaintiff explained that when she performed the simple and non-strenuous task of pulling the nipple of a pacifier out from the base of the pacifier (one of the functions of her assignment), she could feel the muscles in her chest tighten. Id. Plaintiff claimed that she suffered from asthma (although she admitted that she had not been treated for the alleged condition since age seven) and that she believed she might suffer an asthma attack if she overexerted herself. Id.

In response, Playtex immediately had Plaintiff examined by Playtex's occupational health physician, Dr. Aaron Green. Id., at ¶ 9. Dr. Green found that

---

[2]    At this point, Plaintiff did not claim that she was unable to perform the essential functions of the Line Inspector position. She merely stated that she preferred to work as a Quality Control Inspector. Bollinger Aff., at ¶ 7.

Plaintiff had no physical or medical limitations that would preclude her from performing moderately strenuous duties, such as walking, lifting up to 50 pounds, or pushing or pulling objects. Id. Also, Playtex reviewed results of air quality tests it had performed in the Cherubs work area (and other areas of the Dover Plant) and confirmed that the results showed no sign of any irritants that might affect someone with an asthmatic condition.[3] Id.

Notwithstanding Dr. Green's conclusion that Plaintiff was physically capable of performing the essential functions of her assignment, Playtex engaged in an interactive process with Plaintiff by asking her to identify her alleged limitations and by looking for alternative temporary assignments for her to perform. Id., at ¶ 10. Playtex found and offered to Plaintiff a different position – Quality Control Inspector in the Gentle Glide division (which manufactures Playtex's Gentle Glide tampon line). Id. Despite having previously performed that exact position in that exact division (*see* p. 4, *supra*) without incident, Plaintiff declined Playtex's offer and claimed that, due to cotton fibers that she suspected were present throughout most of the Dover Plant, her alleged asthmatic condition was such that the **only** job she was able to perform was Quality Control Inspector in the Drop-ins division. Id.

In response to Plaintiff's baseless demand, on January 5, 2005, Playtex informed Plaintiff that she could either accept either of the two positions that it had offered to her (each of which she was found to be physically capable of performing) or

---

[3]       *See* Expert Reports of Melvin E. Cassady, CIH and Dr. Aaron Green, M.D., M.P.H. (App., at A 4-31).

elect a voluntarily layoff.  <u>Id.</u>, at ¶ 11.  She refused both assignments, claiming that they might cause her to suffer an asthma attack, and elected the layoff.  <u>Id.</u>

<u>ARGUMENT</u>

I.     SUMMARY JUDGMENT STANDARD OF REVIEW.

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).   The moving party bears the initial burden of informing the district court of the basis for its motion.   <u>Id</u>. at 323.   Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).   Rather, once a party moves for summary judgment and claims the absence of evidentiary support for the Plaintiff's case, the burden is on the non-moving party to offer at least a scintilla of evidence to raise a genuine issue of material fact.   <u>See</u>, <u>Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.</u>, 998 F.2d 947, 951 (3d Cir. 1993).

The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with specific evidence establishing that there is a genuine issue of fact.   <u>See Celotex Corp</u>, 477 U.S. at 324.   The non-movant's evidence must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit

9.

under the governing law will properly preclude the entry of summary judgment." Id., 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotes omitted).

In this case, Plaintiff has alleged disability discrimination under Title VII. In Title VII cases, a defendant is entitled to summary judgment if it can show that the plaintiff cannot carry its burden of proof under the burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). That is, a defendant is entitled to summary judgment if: (1) it can show that the plaintiff has failed to establish a *prima facie* case of discrimination; or (2) even assuming a *prima facie* case, the defendant has articulated a legitimate non-discriminatory reason for its action and the plaintiff is unable to produce sufficient evidence to rebut that legitimate reason. See, Janil v. Avdeo Corp., 873 F.2d Supp. 101, 706-707 (3rd. Cir. 1989). The court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the Plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer *intentionally* discriminated against the Plaintiff." Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (emphasis added) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987).

Put simply, because Plaintiff cannot establish a *prima facie* case of disability discrimination, and because there has been no evidence adduced through discovery which could support a finding of intentional discrimination, Playtex is entitled to summary judgment as a matter of law.

II.     DSPC IS ENTITLED TO SUMMARY JUDGMENT
        BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH
        (AND CANNOT ESTABLISH) A *PRIMA FACIE* CASE
        OF DISCRIMINATION.

To succeed on a claim under Title VII, whether based on termination or failure to accommodate, Plaintiff must establish that she was "disabled" for the purposes of the Americans With Disabilities Act ("ADA").[4]  Determining whether an individual has a disability under the ADA requires an individualized inquiry.  See, e.g., Bragdon v. Abbott, 524 U.S. 624, 641-42 (1998) (declining to consider whether HIV infection is a *per se* disability under the ADA).  An individual is considered to have a disability for the purposes of the ADA if that individual has "a physical impairment that substantially limits one or more of the major life activities."  42 U.S.C. § 12102(2).  The ADA does not define the terms "substantially limits" and "major life activities."  Therefore, courts often turn to the Equal Employment Opportunity Commission Regulations ("EEOC Regulations") for guidance.  Deane v. Pocono Med. Ctr., 142 F.3d 138, 143 n.4 (3d Cir. 1998); but see Sutton v. United Air Lines, 527 U.S. 471, 479 (1999) ("No agency, however, has been given authority to issue regulations implementing the generally applicable provisions of the ADA, see 42 U.S.C. §§ 12101-12102, which fall outside Titles I-V.").

According to the EEOC Regulations, the term "substantially limits" means: "[u]nable to perform a major life activity that the average person in the general population can perform", or "[s]ignificantly restricted as to the condition, manner or

---

[4]     Plaintiff could also meet her initial burden by establishing that she had a record of a disability or was regarded as having a disability.  *See* 42 U.S.C. § 12102(2)(B),(C).  In this case, Plaintiff has not made (and has no basis to make) a "record of" or "regarded as" claim.

duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration which the average person in the general population can perform that same major life activity." 29 CFR § 1630.2(j). "'Substantially' in the phrase 'substantially limits' . . . clearly precludes impairments that interfere in only a minor way with the performance of [a major life activity] from qualifying as disabilities." Toyota Motor Manufacturing , Kentucky, Inc. v. Williams,, 534 U.S. 184, 196-97 (2002).

According to the EEOC Regulations, the term "major life activities" includes basic functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 CFR § 1630.2(i).

In this case, Plaintiff has not identified which, if any, major life activities she claims to have been limited in performing. In her Complaint, Plaintiff suggests that Playtex discriminated against her by not providing her with an accommodation in the form of an assignment that would not have involved exposure to cotton. From that, one can reasonably presume that Plaintiff may assert that she was limited in performing the activities of breathing and working. Unfortunately for Plaintiff, there is no evidence in the record to support a finding that she was substantially limited in performing either of those major life activities (or, for that matter, any such activities recognized by law).

In fact, just the opposite is true. In January 2003, immediately after Plaintiff informed Playtex that she believed she was unable to perform the temporary assignment of Line Inspector in the Cherubs division, Playtex had her examined by Dr. Green. Bollinger Aff., at ¶ 9. Dr. Green determined that Plaintiff was not experiencing

any breathing difficulties and had no physical or medical limitations that would preclude her from performing the essential functions of that assignment.[5] Id.

Plaintiff has not offered (because there is no) evidence to rebut Dr. Green's medical diagnosis.[6] Accordingly, the undisputed evidence shows conclusively that Plaintiff was not substantially limited in performing any major life activities and, therefore, Plaintiff has failed to make a *prima facie* case of discrimination.

III.     ALTERNATIVELY, PLAYTEX IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF HAS FAILED TO OFFER (AND CANNOT OFFER) ANY EVIDENCE SHOWING THAT PLAYTEX'S NON-DISCRIMINATORY REASONS FOR ITS ACTIONS ARE A PRETEXT FOR DISCRIMINATION.

As indicated above, even if the Court was to find that Plaintiff has made a *prima facie* case of discrimination, Playtex is still entitled to summary judgment. Under the well-known McDonnell Douglas standard, a claim under the ADA is tested in three

---

[5]     Additionally, Playtex conducted air quality testing in the areas in which Plaintiff was to be assigned to work (Gentle Glide and Cherubs) and found that those areas did not contain any detectable levels of chemicals or fibers (including cotton). Subsequently, Playtex's occupational health physician, Dr. Green, who examined Plaintiff in 2003, examined the air quality results and opined that Plaintiff could have worked in any area of the Dover Plant without any affect on her breathing or her alleged asthmatic condition. See Expert Reports of Mr. Cassady and Dr. Green (App., at A 4-31).

[6]     Even if Plaintiff established that she actually suffers from some form of asthma, she still could not satisfy her burden since she has not shown (and cannot show) that her alleged condition substantially limited her ability to breathe (see *What Constitutes Substantial Limitation on Major Life Activity of Breathing For Puposes of Americans With Disabilities Act*, 194 A.L.R. 455, at § 7[a] (reviewing cases in which controllable asthmatic conditions were found to not constitute disabilities under the ADA)) or her ability to work (see Walker v. Pepsi-Cola Bottling Co., 2000 WL 1251906, at *18 (D. Del. Aug. 10, 2000) (noting that to make a claim under the substantial life activity of working, a plaintiff must prove that she is restricted from performing an entire class or range of jobs) (Ex. 1 hereto)).

13.

stages.  If a plaintiff satisfies the first stage of establishing a prima facie case of discrimination, the burden shifts to the defendant "to articulate some legimate, non discriminatory reason" for its actions.  <u>McDonnell Douglas</u>, 411 U.S. at 802  If that second stage is satisfied, in stage three, the plaintiff bears the burden of proving "by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination."  <u>Id.</u> at 805.

Here, Plaintiff complains that Playtex failed to accommodate her by allowing her to work as a Quality Control Inspector in the Drop-ins division (the one and only position she claimed she was physically capable of performing, even though it did not differ from the other Quality Control Inspector position Playtex offered her as an (unneeded) accommodation, and by terminating her when she refused to perform any assignment other than that one.  With respect to the failure to accommodate claim, Playtex has explained that it did not allow her to return to her former assignment because it proved, through a physical examination and air quality testing, that Plaintiff did not require the accommodation she requested.  With respect to the termination claim, Playtex has explained that it did not terminate Plaintiff, but rather Plaintiff voluntarily elected a layoff after she refused to accept either of the positions that Playtex offered to her.

To survive summary judgment, then, Plaintiff has the burden of demonstrating, by a preponderance of the evidence, that Playtex's proffered nondiscriminatory reasons are, in fact, false or pretextual.  <u>See Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (per curiam) (citations omitted).  Since Plaintiff cannot point to a single scrap of evidence that would allow her to satisfy that burden, her claims fail as a matter of law.

CONCLUSION

Playtex respectfully submits that Plaintiff has utterly failed to satisfy her burden under the <u>McDonnell Douglas</u> standard and, accordingly, summary judgment should be entered in Playtex's favor and against Plaintiff.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
   Attorneys for Defendant

January 12, 2007

548834v1

## CERTIFICATE OF SERVICE

I, Jason A. Cincilla, Esquire, hereby certify that copies of the foregoing **PLAYTEX PRODUCTS, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** were caused to be served this 12th day of January, 2007, upon plaintiff in the manner indicated:

### VIA FIRST-CLASS MAIL:

Lorna Claycomb
1061 S. Little Creek Road, Lot 15
Dover, Delaware 19901

Jason A. Cincilla (#4232)

525542

# EXHIBIT 1

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

C

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Maurice A. WALKER, Plaintiff,
v.
PEPSI-COLA BOTTLING CO. and TEAMSTERS
LOCAL 830, Defendants.
**No. CIV. A. 98-225-SLR, CIV. A. 99-748-JJF.**

Aug. 10, 2000.

Maurice A. Walker, Wilmington, Delaware. Pro se.

Kathleen Furey McDonough, Esquire of Potter, Anderson & Corroon, Wilmington, Delaware. Counsel for Defendant Pepsi-Cola Bottling Co. Of Counsel: Walter E. Johnson, Esquire and Amy R. Walker, Esquire of Kilpatrick Stockton LLP, Atlanta Georgia.

Clifford B. Hearn, Jr., Esquire, Wilmington, Delaware. Counsel for Defendant Teamsters Local 830. Of Counsel: Stephen J. Holroyd, Esquire of Sagot, Jennings & Sigmond, Philadelphia, Pennsylvania.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

**\*1** Plaintiff Maurice A. Walker filed this action *pro se* on May 1, 1998 against defendants Pepsi-Cola Metropolitan Bottling Co. ("Pepsi"), incorrectly named in the complaint as Pepsi-Cola Bottling Co., and Teamsters Local 830 ("Teamsters") alleging race, disability, and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e)-2 *et seq.* (1994), the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12112 *et seq.* (1994), and the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. §§ 621-634. Plaintiff also alleges a violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.Stat. Ann. § 951 *et seq.* (West 2000), and breach of contract. He filed a separate, but identical, complaint in this court on November 4, 1999. *See* 99-748-JJF. Upon defendants' motion, these cases were consolidated into a single civil action. (D.I.80)

Currently before the court are motions for summary judgment filed by Pepsi and the Teamsters. (D.I.61, 63) In lieu of responding to these motions, plaintiff filed his own motion for summary judgment. (D.I.71) The court has jurisdiction over plaintiff's federal claims by virtue of 28 U.S.C. § 1331 and supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367. For the following reasons, the court shall deny plaintiff's motion for summary judgment and grant both Pepsi's and the Teamsters' motions.

II. BACKGROUND

Plaintiff is a thirty-four year old, African-American male. Pepsi manufactures carbonated drinks at its Wilmington, Delaware facility and distributes them throughout Delaware, Pennsylvania, and New Jersey. The Wilmington plant is organized into various departments, and its 187 or so employees are represented by defendant Teamsters. (D.I. 65, McKinnon Aff., at A244) Plaintiff was a member of the Teamsters.

Plaintiff's complaint arises out of various instances of alleged discrimination and harassment during his employment at Pepsi's Wilmington bottling facility. Neither plaintiff's complaint nor his briefs in support of his motion for summary judgment are models of clarity. Indeed, it is not always clear what actions form the basis of plaintiff's varied federal and state charges or whether plaintiff's charges are directed at both defendants or only one. For example, plaintiff's complaint accuses "Defendant,"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

in the singular, of various unlawful actions without specifying which defendant is responsible. Plaintiff's uncooperative and evasive deposition testimony only further complicates the task of discerning his claims. (*See, e.g.,* D.I. 62, Walker Depo., at A138-48)

In spite of these obstacles, the following factual synopsis represents the court's best efforts to organize plaintiff's charges in a logical fashion. In doing so, the court relies primarily on undisputed documentary evidence, plaintiff's deposition testimony, and affidavits submitted by defendants. Plaintiff's allegations are organized into three categories: (1) Racial harassment related to plaintiff's initial January 1996 termination; (2) Discrimination in Pepsi's job bidding procedures; and (3) Discrimination resulting in his final July 1997 discharge.

1. Racial harassment and plaintiff's January 1996 termination

**\*2** Pepsi hired plaintiff on May 22, 1995 in the Wilmington plant's Operations Department. In January 1996, plant officials fired plaintiff. Apparently, they regarded plaintiff as a "probationary employee" and promptly fired him over charges of excessive absenteeism. (D.I. 65, Walker Depo., at A103-04; D.I. 72, Absentee Rep., Ex. F-1) The Teamsters interceded and successfully argued that, under the collective bargaining agreement then in force, plaintiff was not a probationary employee. (D.I. 62, Grace Aff., at A448) Pepsi reinstated plaintiff to his previous position with full seniority retroactive to his original hiring date.

Plaintiff contends that he was fired because Pepsi's Plant Manager (Richard Chominski) harbored racial animus toward him. In sole support of this contention, plaintiff claims that Chominski labeled him "ignorant" and a "scam artist" during a confrontation with plaintiff prior to his termination. (D.I. 71 at 8) On December 6, 1996, plaintiff filed a grievance with the Teamsters concerning Chominski's alleged harassment. The grievance did not accuse Chominski of racial harassment. The

Teamsters concluded that the "grievance lack[ed] sufficient merit to justify submitting it to arbitration." (D.I. 62, 5/28/97 Grievance Response, at A415) It appears from plaintiff's complaint and supporting briefs that he believes that the Teamsters' refusal to arbitrate the grievance was motivated by racial discrimination.

2. Racial Discrimination in Pepsi's Job Bidding Procedures

After plaintiff's reinstatement to Pepsi's Operations Department, plaintiff bid on an "Extra Man" position [FN1] in the Sales Department of Pepsi's Wilmington plant. Under the Collective Bargaining Agreement [FN2] ("the Agreement") in force with the Teamsters, Pepsi must fill vacant "bargaining unit" positions through a bidding process. (D.I. 65, McKinnon Aff., at A245) Only union members are eligible to bid on vacant positions. The Agreement provides in pertinent part that:

> FN1. The "Extra Man" drives a sales truck and delivers Pepsi products when regular sales personnel are absent. (D.I. 65, McKinnon Aff., at A245)

> FN2. The collective bargaining agreement is part of the record at bar. (*See generally* D.I. 65 at A12-A43)

> Preference in bidding will be given to employees in the Department in which the opening occurs. The job will be awarded based on the employee having pre-requisite qualifications within the Department with further consideration of the employee's seniority. For employees possessing equal skills and ability, the most senior employee shall be awarded the bid. If no employee within the Department qualifies, candidates from other departments who are qualified will be awarded the job based on Company seniority....

(D.I. 65 at A26-27) After the bidding process had closed in June 1996, Pepsi's Territorial Sales Manager (Joe Burns) determined that plaintiff had bidding preference for the Extra Man position. (D.I. 65, Burns Aff., at A248) Plaintiff then assumed the Extra Man position, although it is not apparent for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

(Cite as: 2000 WL 1251906 (D.Del.))

how long. Following the award to plaintiff, another employee (Dan Cooney) filed a grievance claiming that he had seniority in the Sales Department and that he should have been awarded the Extra Man position. (D.I. 62, 9/11/96 Grievance, at A452; D.I. 65, 6/5/96 Cooney bid form, at A3) Upon investigation, Pepsi officials determined that Cooney had thirty days seniority in the Sales Department while plaintiff had none. Consequently, Pepsi removed plaintiff from the Extra Man position and awarded it to Cooney.

**3** Plaintiff disputes his lack of seniority and contends that his removal from the Extra Man slot was motivated by the racial animus of Joe Burns. According to plaintiff, Burns berated plaintiff for failing to deliver Pepsi products to a customer and peppered his tirade with vulgarities such as "fucking nigger." [FN3] (D.I. 65, Walker Depo., at A108-112, A114-118) This episode allegedly occurred prior to Cooney's grievance. Plaintiff also argues that, after replacing him with Cooney, Pepsi should have bumped a white employee with less seniority (Bob Seward) from an Extra Man position and given it to plaintiff in compensation for the Cooney incident. (D.I. 71 at 14) Pepsi responds that Seward was not an Extra Man until January 1997, well after Pepsi had resolved Cooney's grievance.

> FN3. Prior to his September 16, 1999 deposition, plaintiff never accused any of his supervisors of using racially derogatory language. In fact, plaintiff previously filed two charges with the Equal Employment Opportunity Commission ("EEOC") and testified before an arbitrator about his employment at Pepsi but never suggested that Burns or anyone else at Pepsi used racial slurs.

Around this time, plaintiff filed two grievances complaining about his removal from the Wilmington Sales Department. The grievances are vague, and it is difficult to determine whether plaintiff is complaining about the Cooney incident or the later Seward incident. Neither grievance mentions the alleged Burns tirade. (D.I. 62, 11/1/96 Grievance, at A409; 1/14/97 Grievance, at A432) In

any event, the Teamsters declined to arbitrate either grievance. (D.I. 62, 5/28/97 Grievance Responses, at A410, A433) Their refusal to arbitrate these (and other) grievances appears to form the basis of plaintiff's racial discrimination charges against the Teamsters. (D.I. 71 at 13-15)

In an attempt to mollify plaintiff, Pepsi offered him an Extra Man sales position in West Chester, Pennsylvania. Plaintiff refused, opting instead to remain in the Wilmington Operations Department. (D .I. 65, Burns Aff., at A249) Plaintiff filed still another grievance on December 6, 1996 claiming that he had a right to "Lead Man" pay at the Wilmington plant. (D.I. 62, 12/6/96 Grievance, at A417) At the time, the position was held by another employee (Edward Fisher) who, like plaintiff, is African-American. (D.I. 65, McKinnon Aff., at A245) According to Pepsi, the Lead Man designation is a semi-supervisory position awarded based on the discretion of management and not according to the bidding provisions of the Collective Bargaining Agreement. (D.I. 65, McKinnon Aff., at A245) Pepsi refused to accord plaintiff Lead Man pay, and the Teamsters declined to arbitrate plaintiff's December 1996 grievance. [FN4] (D.I. 65, 5/28/97 Grievance Response, at A418)

> FN4. Plaintiff also filed another grievance on December 6, 1996 claiming harassment by one of his supervisors. (D.I. 62 at A420) The Teamsters obtained a settlement of this grievance that resulted in the removal of an insubordination warning from plaintiff's file. (D.I. 62, 5/28/97 Grievance Response, at A421)

Another bidding dispute arose when plaintiff attempted to bid on a "Bottle Line" position at the Wilmington plant. Pepsi ultimately awarded the position to a white employee (Dave Carson). Plaintiff filed a grievance on January 8, 1997 with the Teamsters claiming that he had seniority over Carson. (D.I. 62, 1/8/97 Grievance, at A423) The record indicates that Carson had a seniority date of May 3, 1995, whereas plaintiff's seniority date was May 22, 1995. [FN5] (D.I. 65, Employment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

Records, at A1-2) In spite of this documentary evidence, plaintiff insists that Carson's seniority date was September 11, 1995 and that Plant Manager Chominski somehow altered the records and "put" Carson's seniority date "over" plaintiff's. (D.I. 71 at 16-17) The Teamsters declined to arbitrate this grievance. (D.I. 62, 5/28/97 Grievance Response, at A424)

> FN5. The Teamsters were apparently confused about these dates. In a July 16, 1997 letter to the EEOC, the Teamsters' legal counsel erroneously explained that Carson's seniority date was September 11, 1995. (D.I. 72, Ex. G, at 3)

**\*4** Immediately prior to bidding on the Bottle Line position, on December 27, 1996 plaintiff bid on, and was awarded, a second shift Pallet Repair position. (D.I. 65 at A5) After assuming the Pallet Repair position in early January 1997, plaintiff submitted a January 6, 1997 bid on an Extra Man position that opened in the Wilmington Sales Department. (D.I. 65 at A6) Pepsi denied plaintiff's bid because the Collective Bargaining Agreement prohibits successful bidders from rebidding for a second position until 180 days after placement in the job for which he or she previously had bid. (D.I. 65 at A27) Despite this explicit provision, plaintiff filed a grievance (D.I. 62 at A432), which the Teamsters declined to prosecute. [FN6] (D.I. 62, 5/28/97 Grievance Response, at A433)

> FN6. Plaintiff filed at least two other grievances with the Teamsters. (D.I. 62 at A426, A429) Plaintiff does not discuss them in any detail in his complaint or in the briefs supporting his motion.

3. Discrimination resulting in Plaintiff's July 1997 Discharge

Plaintiff continued at the Pallet Repair position for the remainder of his employment at Pepsi. On March 5, 1997, plaintiff allegedly strained his back while working on a pallet. It is unclear how much time plaintiff missed because of this injury. Plaintiff contends that he missed "approximately most of the

month of April [and] part of the month of May." (D.I. 65, Walker Depo., at A124) In May, Pepsi received conflicting physician reports concerning plaintiff's ability to work. One physician determined that plaintiff could return to work so long as he observed light duty work restrictions. (D.I. 65 at A69) Another doctor concluded that plaintiff suffered thoracic strain but "that his orthopedic examination was within normal limits" and that he could return to work without any restrictions. (D.I. 65 at A71-73)

Plaintiff returned to work on June 2, 1997 and was assigned to a palletizer machine. [FN7] Plaintiff complained to Plant Manager Chominski that the job exceeded his light duty restrictions because it required him to bend over a railing and retrieve soda cans jammed in the machinery. (D.I. 62, Walker Depo., at A105-06) Plaintiff contends that Chominski responded that, "if [he] wanted a job at Pepsi and if [he] wasn't 100 percent to do the job, [he] wouldn't have a job at Pepsi." [FN8] (D.I. 62, Walker Depo., at A106) Plaintiff contends his back began to bother him after several hours on the palletizer and that he called out sick from work at least twice that week. (D.I. 62, Walker Depo., at A106)

> FN7. No party explains exactly what a palletizer does or the degree of physical labor involved in operating it.
>
> FN8. Plaintiff filed a grievance concerning this incident. (D.I. 62, 6/20/97 Grievance, at A396) It does not appear that the Teamsters arbitrated the grievance.

He returned to work on Monday, June 9, 1997. At that time, plant supervisors ordered him to prepare the "pre-mix/post-mix" tanks, but plaintiff complained again that this task did not fall under his light duty work restrictions because it involved lifting. (D.I. 62, Walker Depo., at A109-10) Apparently, the task involved lifting small tanks and emptying them of stale syrup. [FN9] It appears that plaintiff called out sick later that week.

> FN9. Defendants do not dispute plaintiff's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

account of preparing "pre-mix/post-mix" tanks. In his deposition, plaintiff explained that:
I had to prepare the tanks, prepare the tanks for refilling of soda products, which is syrup. And to prepare the tanks, 16 tanks come into a square pallet. Each tank stands approximately two feet tall. Part of the job was to relieve the pressure from the tanks, and if they had any stale product or old product in it, I was to empty the tanks and to place the tanks back into the pallet, ready for the day shift to refill them again. (D.I. 62 at A107-08)

In an attempt to determine the extent of plaintiff's work restrictions, Pepsi arranged for an independent medical examination of plaintiff. As plaintiff entered the plant on June 16, 1997, he was informed that he had an appointment with an independent medical examiner. (D.I. 62, Walker Depo., at A102-04) Although plaintiff initially agreed to submit to this examination, he later refused, citing the need for a union representative. (D.I. 62, Walker Depo., at A104) After refusing to attend the examination, it appears that plaintiff was assigned temporarily to other duties at the plant. (D.I. 62, Walker Depo., at A122)

**\*5** Later in the day on June 16th, Pepsi's Tri-State Market Unit Manager, Lynn Nowicki, allegedly observed plaintiff daydreaming while sitting on a forklift. She approached plaintiff and asked him what he was doing, but he did not answer her. Plaintiff claims that she surprised him and that, due to the shock of this surprise, he was unable to form coherent responses to her questions. [FN10] Later, in his deposition testimony, he denied the daydreaming charge and claimed that he was preparing to lift pallets with the forklift.

> FN10. Plaintiff's failure to respond is, perhaps, best explained in his own words:
> The actual, what Miss Nowicki asked, I do not recall because I was so dazed and surprised, you know, I have been in the military before, and someone to surprise me, I do not take that kindly. (D.I. 62,

Walker Depo., at A115)

After confronting plaintiff, Nowicki conferred with the Second Shift Supervisor (Larry Clayton) and the plant Human Resources Manager (Allison McKinnon). The latter two then met with plaintiff and handed him a disciplinary action form for failing to perform his assigned tasks. [FN11] (D.I. 62, Walker Depo., at A120-23) That form has not been made part of the record.

> FN11. Plaintiff later filed a harassment grievance against Nowicki, Clayton, and McKinnon over this incident. (D.I. 62, 6/20/97 Grievances, at A392, A394, A395) The grievances vaguely describe harassment related to their refusal to accommodate plaintiff's "physical capacities."

Following this incident, the events leading to plaintiff's termination become even more confused and bizarre. Apparently, after his disciplinary meeting, Clayton ordered plaintiff to first take a short break and then begin cleaning a certain section of the plant. (D.I. 62, Walker Depo., at 127) Plaintiff claims that he began to clean this section of the plant. (D.I. 62, Walker Depo., at A127-28) At some point in the shift, Clayton stopped plaintiff, who was on the way to the plant's locker room to get medication and to use the bathroom. (D.I. 62, Walker Depo., at A128) According to plaintiff, Clayton refused to allow him to use the plant's bathroom or to retrieve his medication from the plant locker room. Clayton then allegedly told plaintiff to leave. (D.I. 62, Walker Depo., at A128-31) Pepsi has submitted no affidavit or deposition testimony to refute plaintiff's account of Clayton's behavior. [FN12]

> FN12. Pepsi did submit a transcript of Clayton's prior sworn testimony in an arbitration hearing. (D.I. 65 at A207-243) Although this testimony contradicts plaintiff's account of that day, this prior testimony is hearsay and not admissible for purposes of summary judgment. *See* Fed.R.Evid. 804(b)(1) (prior sworn

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

testimony is admissible only where declarant unavailable); *see also Trustees of Univ. of Pa. v. Lexington Ins. Co.,* 815 F.2d 890, 905 (3d Cir.1987) (noting that, "[a]dmission of prior testimony through a court transcript, merely because the testimony was observed and recorded pursuant to duty imposed by law, would emasculate large portions of the hearsay rule").

Plaintiff left the plant and went immediately to a nearby Veterans' Administration Hospital to receive treatment for back pain. (D.I. 62, Walker Depo., at A132) From there, he allegedly called Clayton and informed him that he would not return to work to complete his shift and that he would be out of work the next day, June 17, 1997. (D.I. 62, Walker Depo., at A132) Plaintiff also missed work on June 18 and 19, 1997. Plaintiff testified that it was "highly unlikely" that he notified his supervisors in advance of his absence on the 18th. (D.I. 62, Walker Depo., at A138) As for his June 19th absence, plaintiff arrived at work long enough to retrieve his paycheck, and he claims that he informed the Human Resources Director (Allison McKinnon) that he would not be working that day. (D.I. 62, Walker Depo., at 138-39) Plaintiff apparently did not work on June 20th but nonetheless made an appearance at the plant to file grievances against various supervisors. (D.I. 62, Walker Depo., at A156)

Plaintiff was scheduled to work the following week from June 23-26, 1997. (D.I. 65, Work Schedule, at A7) Plaintiff did not work on any of these days and failed to notify anyone that he would be absent for at least two of these days. (D.I. 62, Walker Depo., at A159-60) Plaintiff claims that he did not show up for work because his name was not on the "manning sheet" for the week of June 23rd. (D.I. 62, Walker Depo., at A156-57) When confronted at his deposition with the manning sheet showing his name, plaintiff claimed that Pepsi officials falsified it. (D.I. 62, Walker Depo., at A157-58) Despite his absences that week, he appeared at the plant to retrieve his paycheck on June 26th and to discuss a pending harassment grievance with Plant Manager

Chominski. (D.I. 62, Walker Depo., at A159-61)

**\*6** On June 26, 1997, Plant Manager Chominski suspended plaintiff from work for violation of Pepsi's attendance and call-in policy. Pepsi's "Tri-State Absentee/Tardiness & Leave Early Policy" ("the Absentee Policy") states that:

Employees who will be late or absent are to call in to their immediate supervisor at least thirty (30) minutes prior to the start of their shift. Any employee who fails to follow this procedure and does not report to work or call in within two (2) hours of the start of his/her shift will be classified as "NO CALL-NO SHOW." Repeated incidents of "NO CALL-NO SHOW" will result in disciplinary action, up to and including discharge.

(D.I. 65 at A11) In a July 3, 1997 letter to plaintiff, Chominski asked plaintiff to attend a meeting on July 10th to defend himself against charges that he repeatedly violated the Absentee Policy's call-in provisions. (D.I. 65 at A8) Plaintiff claims that he presented medical documents excusing his absences at the meeting. (D .I. 62, Walker Depo., at A167-69) Although these documents accounted for his underlying illnesses, they could not explain plaintiff's failure to notify his supervisors of his impending absences. Consequently, Chominski terminated plaintiff's employment.

Following his termination, plaintiff filed a grievance with the Teamsters. They protested plaintiff's termination, and the protest eventually prompted an arbitration hearing. Hearings were held on October 21, 1998 and April 21, 1999, and plaintiff was represented by legal counsel. The arbitrator upheld the termination but awarded plaintiff $1,000 for Pepsi's refusal to allow plaintiff to obtain a union representative during the disciplinary hearing with Chominski and McKinnon held after Nowicki observed plaintiff's "daydreaming" on a forklift. (D.I. 65, Arbitrator's Opinion and Award (6/29/99), at A87-98)

Plaintiff also filed two discrimination charges with the EEOC against Pepsi and one discrimination charge against the Teamsters with the Pennsylvania Human Relations Commission ("PHRC") and the EEOC. The first, filed prior to his termination on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

April 28, 1997, alleged that Pepsi had discriminated against him on the basis of race. He also filed this charge contemporaneously with the Delaware Department of Labor ("DDOL"). These allegations stemmed from plaintiff's unsuccessful bids for the Extra Man, Lead Man, and Bottle Line positions. He also accused Chominski of harassment and Pepsi of wholesale discrimination against African-Americans. (D.I. 65 at A44-45) The EEOC issued a right to sue notice on September 30, 1997. (D.I. 65 at A79)

The second charge, filed on the same day with the PHRC and the EEOC, alleged that the Teamsters discriminated against him because of his race by refusing to process his grievances. (D.I. 62 at A438) This second charge made no mention of Pepsi. The EEOC issued a right to sue notice on September 30, 1997. (D.I. 62 at A442) The PHRC declined to prosecute plaintiff's charge. (D.I. 62 at A440)

*7 Plaintiff filed his third discrimination charge with the EEOC on October 22, 1997. (D.I. 65 at A80) He did not file this charge with the DDOL. In this charge, he accused Pepsi of discriminating against him on the basis of his perceived disabilities and of retaliating against him for filing his first EEOC charge. (D.I. 65 at A80-81) He did not allege race discrimination. The EEOC issued a right to sue notice on August 3, 1999. (D.I. 65 at A99)

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life*

*Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

IV. THE TEAMSTERS' MOTION FOR SUMMARY JUDGMENT

As is evident from the foregoing factual analysis, plaintiff's claims against the Teamsters rest essentially on their failure to arbitrate several of his numerous grievances against Pepsi supervisors. Plaintiff appears to allege that the Teamsters discriminated against him because of his age, race, and alleged disabilities. [FN13] He also alleges that the Teamsters violated the collective bargaining agreement. The court shall construe this particular charge as a § 301 claim arising under the Labor Management Relations Act ("LMRA"). *See* 29 U.S.C. § 185. Finally, plaintiff appears to claim that the Teamsters violated the PHRA. *See* 43 Pa. Cons.Stat. Ann. §§ 951 *et seq.* (West Supp.2000).

FN13. The use of the word "appears" is particularly appropriate because, as noted, plaintiff's complaint refers to both the Teamsters and Pepsi as "defendant" and does not delineate which is responsible for what. Furthermore, his briefs in support of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: 2000 WL 1251906 (D.Del.))**

his cross motion discuss only his claims against Pepsi.

## A. Plaintiff's Age Discrimination Claim

**\*8** Plaintiff's age discrimination claim against the Teamsters must fail because he is not in the class protected by the ADEA. The ADEA's protections apply only to individuals who are at least forty years of age. *See* ADEA, 29 U.S.C. § 631(a). Plaintiff testified in his deposition that he was born in 1966. (D.I. 62, Walker Depo., at A4) Thus, by virtue of his birth date, plaintiff falls outside the class protected by the ADEA. The court, therefore, shall grant the Teamsters' motion for summary judgment on plaintiff's age discrimination claim.

## B. Plaintiff's Title VII Race Discrimination Claim

In his EEOC charge, plaintiff complained that the Teamsters refused to pursue his grievances against Pepsi "through the same number of steps (up to and including arbitration) through which it pursues grievances filed by [w]hite members." (D.I. 62, 4/28/97 EEOC charge, at A438) Although this charge does not appear in plaintiff's complaint or in his briefs, the court will construe the complaint broadly to include the fair representation claim raised in his EEOC charge. At issue is whether plaintiff has adduced sufficient facts to survive the Teamsters' motion for summary judgment.

To state a prima facie Title VII race discrimination claim against the Teamsters, plaintiff must establish (1) that the employer breached the collective bargaining agreement with respect to him; (2) that the union violated its duty of fair representation by permitting the breach to go unrepaired; and (3) that there is some indication that the union's actions were motivated by discriminatory animus. *See Webb v. Merck & Co.,* No. C.A. 99- 413, 1999 WL 387122, at \*3 (E.D.Pa. May 20, 1999) (citing *York v. American Telephone & Telegraph,* 95 F.3d 948, 955-56 (10th Cir.1996); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 868 (7th Cir.1985)). If plaintiff makes a prima facie showing, the burden shifts to the Teamsters to establish a legitimate, nondiscriminatory reason for failing to pursue

plaintiff's grievances. If the Teamsters establish such a reason, plaintiff bears the burden of demonstrating that the Teamsters stated reasons are pretextual.

The court need not engage in an extensive burden shifting analysis because plaintiff has not presented facts sufficient to state a prima facie case. Specifically, the record lacks any evidence that plaintiff's race played a role in the Teamsters' decision to not arbitrate several of his grievances. In fact, plaintiff admitted that no Teamsters representative ever indicated that race played a role in the review of his grievances. (D.I. 62, Walker Depo., at A347- 49) Furthermore, plaintiff admitted in his deposition that he simply did not know why certain of his grievances were not processed. (D.I. 62, Walker Depo., at A347) In lieu of evidence, plaintiff relies on mere speculation to support his charge that race played a role in the grievance process. Mere speculation, however, is no substitute for evidence raising an inference of race discrimination. Indeed, the evidence at bar raises precisely the opposite inference. The Teamsters investigated all of his grievances and pursued at least three with Pepsi, winning favorable results for plaintiff. (D.I. 62, 5/28/97 Grievance Responses, at A412, A421; Grace Aff., at A448 ¶ 6) Moreover, they protested his July 1997 discharge and brought the issue to arbitration even after plaintiff had filed his EEOC charge against them. (D.I. 62, Grace Aff., at A450 ¶¶ 18-21) In fact, due to plaintiff's pending EEOC charge against them, Teamsters officials worried that representing plaintiff at the arbitration could be a conflict of interest. So, at their own expense, they hired an independent attorney of plaintiff's own choosing to represent him at the arbitration. (D.I. 62, Grace Aff., at A450 ¶ 20) These extraordinary efforts belie plaintiff's race discrimination charges. Consequently, the court shall grant the Teamsters' motion for summary judgment on plaintiff's Title VII claim. [FN14]

> FN14. To the extent that he raises a retaliation claim against the Teamsters, the absence of any evidence of retaliation requires that the court grant summary judgment on this claim in favor of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

Teamsters.

C. Plaintiff's ADA Claim

**\*9** Plaintiff appears to allege that the Teamsters also discriminated against him because of his alleged disabilities. Courts examine ADA claims under the same burden-shifting framework employed in Title VII cases. *See Lawrence v. National Westminster Bank N.J.,* 98 F.3d 61, 70 (3d Cir.1996). Accordingly, the court first must determine whether plaintiff has established a prima facie case.

Setting aside the question of whether plaintiff is a qualified person with a disability under the ADA, plaintiff's ADA claim suffers from the same infirmity as his Title VII claim: namely, a lack of evidence of discriminatory animus on the part of the Teamsters. *See Webb,* 1999 WL 387122, at \*3 (requiring a showing of discriminatory animus in a prima facie Title VII case against a union). Plaintiff has offered no documentary evidence supporting his claim of discriminatory animus and, when given the opportunity at his deposition to offer factual support for such a claim, he could not name a single instance where Teamsters representatives exhibited discriminatory animus toward him because of his disability. (D.I. 62, Walker Depo., at A347-48) Moreover, as noted, there is ample evidence that the Teamsters investigated his grievances and won favorable results for plaintiff on at least three occasions. Because there are no facts supporting his ADA claim, the court shall grant summary judgment in favor of the Teamsters.

D. Plaintiff's LMRA Claim

Plaintiff's allegation that the Teamsters breached the collective bargaining agreement, which plaintiff frames as a state common law claim, must be resolved under § 301 of the LMRA. *See* 29 U.S.C. § 185(c) (providing for federal jurisdiction over breach of collective bargaining contracts); *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.,* 369 U.S. 95, 103 (1962) (holding that federal labor law is paramount in disputes concerning collective

bargaining agreements). In the typical § 301 claim, the employee sues the union for breach of its duty of fair representation and the employer for breach of the collective bargaining agreement. *See Vadino v. A. Valey Eng'rs,* 903 F.2d 253, 260 (3d Cir.1990) . At this point, the court shall address only the Teamsters' motion for summary judgment on plaintiff's LMRA claim.

The Teamsters argue that plaintiff's LMRA claim is untimely. A § 301 claim must be filed within six months from the date of its accrual. *See* 29 U.S.C. § 160(b); *Vadino,* 903 F.2d at 260. The limitations period commences when "the plaintiff receives notice that the union will proceed no further with the grievance." *Vadino,* 903 F.2d at 260 (internal quotations and citations omitted). In his EEOC charge, plaintiff complained that the Teamsters failed to process grievances he filed between October 20, 1996 and January 14, 1997. (D.I. 62 at A438) On May 28, 1997, plaintiff received final notification that the Teamsters would not pursue these grievances. (D.I. 62 at A409-33) Plaintiff, however, did not file suit until December 30, 1997. Accordingly, plaintiff's LMRA claims against the Teamsters are time-barred.

**\*10** Even if the claims were timely, plaintiff has provided no evidence from which a reasonable jury could conclude that the Teamsters violated the duty of fair representation. The Teamsters investigated each of plaintiff's grievances and brought at least one to arbitration. They also secured favorable results for plaintiff on at least two occasions. Plaintiff's claim rests only on his contention that the Teamsters should have pursued all of his grievances to arbitration. It is settled, however, that unions enjoy considerable discretion in handling the grievances of their members. *See Air Line Pilots Ass'n v. O'Neil,* 499 U.S. 65, 67 (1999). This is sensible. Requiring a union to bring every grievance to arbitration would strain the union's resources and damage its credibility.

For these reasons, the court shall grant the Teamsters' motion for summary judgment on plaintiff's LMRA claim.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

E. Plaintiff's PHRA Claim

Finally, plaintiff raises a claim under the PHRA. The PHRA essentially mirrors Title VII in its prohibition of discriminatory employment practices. In fact, Pennsylvania courts employ the same burden-shifting analytical model used in federal employment discrimination cases. *See Campanaro v. Pennsylvania Elec. Co.,* 738 A.2d 472, 476 (Pa.Super.Ct.1999), *appeal denied,* 751 A.2d 183 (Pa.2000). As noted in the court's Title VII and ADA discussion, plaintiff has failed to set forth a prima facie case of discrimination on the basis of his race or alleged disabilities. For the reasons stated therein, his PHRA claim also must fail. [FN15] To the extent that plaintiff raises a retaliation claim based on his filing of a complaint with the Pennsylvania Human Relations Commission ("PHRC"), that claim also must fail. The Teamsters received notice of plaintiff's filing with the PHRC on June 27, 1997. (D.I. 62 at A435) The majority of the alleged discriminatory practices predated notice of this filing. Moreover, plaintiff has adduced no evidence of retaliation after the Teamsters received notice of his filing. Consequently, the court shall grant the Teamsters' motion for summary judgment on this claim.

> FN15. Plaintiff's PHRA claim also can be dismissed in light of the fact that plaintiff was not employed in, or a resident of, Pennsylvania at the time of the alleged discrimination by the Teamsters. At least one court has found that a plaintiff cannot invoke the PHRA where he lacked any contacts with the Commonwealth of Pennsylvania during the course of his employment. *See McCreary v. Sears Roebuck & Co.,* Civ. A. No. 85-5199, 1987 WL 13748 (E.D.Pa. Jul. 14, 1987). In that case, Sears terminated McCreary after he had worked for twenty years at a Wilmington, Delaware Sears store. *See id.* at *1. Like plaintiff at bar, McCreary was a Delaware resident and had never worked in Pennsylvania. Given these facts, the district court concluded that McCreary could not invoke the PHRA.

V. PEPSI'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's claims against Pepsi are essentially identical to those leveled against the Teamsters. The court shall dismiss plaintiff's ADEA claim for the reasons discussed above. Furthermore, the court shall dismiss his PHRA claim against Pepsi because he failed to exhaust his administrative remedies by filing a charge with the PHRC naming Pepsi as a defendant. [FN16] *See* 43 Pa. Cons.Stat. Ann. § 959(a) (West Supp.2000); *Bailey v. Storlazzi,* 729 A.2d 1206, 1214 (Pa.Super.Ct.1999) (explaining that, "it is well settled [under the PHRA] that a plaintiff must exhaust all administrative remedies prior to seeking redress in court"). Plaintiff's remaining claims merit further discussion.

> FN16. Plaintiff's charge with the PHRC named only the Teamsters. (D.I. 62 at A438)

A. Plaintiff's Title VII Claims

Construed liberally, plaintiff's complaint alleges unlawful race discrimination, hostile work environment, and retaliation claims. The court shall address each in turn.

1. Race Discrimination

*11 Plaintiff founds his race discrimination claims on several incidents. First, he claims that his initial January 1996 termination was motivated by racial animus. Next, he claims that Pepsi's recision of his Extra Man position was discriminatory. He also alleges that he was denied the Bottle Line position, a second Extra Man slot, and "Lead Man" pay because of his race. Finally, he contends that his July 1997 discharge was motivated by racial discrimination. Each of these accusations requires separate analysis.

Before reviewing these accusations, it is helpful to summarize the analytical framework applicable to Title VII claims. Plaintiff has no direct evidence of racial discrimination. That is, none of plaintiff's evidence establishes racial discrimination without

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

inference or presumption. *See Torre v. Casio, Inc.,* 42 F.3d 825, 829 (3d Cir.1994). Where, as here, a plaintiff offers circumstantial evidence of discrimination, the court must analyze the discrimination claims under the Supreme Court's burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Briefly summarized, the *McDonnell Douglas* analysis proceeds in three stages. First, the plaintiff must present a prima facie case of discrimination. There is no rigid formulation of the prima facie case, and the elements may vary depending on the factual circumstances of the case. [FN17] *See Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 938 (3d Cir.1997). If the plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802. Finally, if the defendant carries this burden, the plaintiff then must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *See Jones v. School Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir.1999). The court shall apply this analytical framework to each of the alleged instances of race discrimination.

> FN17. For this reason, the court has tailored its formulation of the prima facie case to the specific instances of discrimination alleged by plaintiff.

i. The January 1996 Termination

The first alleged instance of racial discrimination occurred when Pepsi terminated plaintiff in January 1996. Pepsi contends that this claim is time-barred.

Title VII imposes time limits on when a plaintiff may file a complaint alleging discriminatory conduct. Where a plaintiff institutes discrimination proceedings pursuant to state law, that plaintiff must file a complaint with the EEOC within 300 days of the alleged discriminatory conduct. [FN18] *See* 42 U.S.C. §§ 2000e-5(e). Any acts that occurred prior to this 300 day period cannot support a Title VII claim. Plaintiff should have filed a charge with the

EEOC regarding his January 1996 termination well before April 28, 1997. Courts, however, recognize exceptions to the statutory time bar. Specifically, the Third Circuit recognizes a continuing violation exception to the timely filing requirement. *West v. Philadelphia Electric Co.,* 45 F.3d 744, 754 (3d Cir.1995). Under this theory, a "plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if [he] can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *Id.* In the interests of a full discussion of plaintiff's claims, the court shall assume plaintiff has alleged a continuing violation.

> FN18. Plaintiff did not include race discrimination allegations in his October 22, 1997 EEOC charge. (D.I. 65 at A80) Unlike his April 28, 1997 EEOC charge, he also did not file this later charge with the DDOL.

**\*12** Turning to the merits of plaintiff's claim, to survive summary judgment plaintiff first must establish a prima facie case of discrimination. Under *McDonnell Douglas,* plaintiff must show that (1) he is a member of a protected class, (2) that he was qualified for the job, (3) that he was fired despite those qualifications, and (4) after his termination, the job remained open and the employer sought applicants with the plaintiff's qualifications. *See McDonnell Douglas,* 411 U.S. at 802; *Matczak,* 136 F.3d at 938. Plaintiff has not come forward with sufficient evidence to satisfy the third and fourth prongs of his prima facie case. Pepsi rehired plaintiff after it terminated him. Further, plaintiff has submitted no evidence that his position remained open after his termination or that Pepsi sought applicants with plaintiff's qualifications.

Even assuming plaintiff has come forth with evidence sufficient to establish a prima facie case, Pepsi has offered a legitimate, nondiscriminatory reason for firing him. When it initially terminated him, Pepsi officials thought that plaintiff was a "probationary employee." Under the Collective Bargaining Agreement, "the first ninety (90)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

working days shall be considered a trial period, and during such trial period, [Pepsi has] the unqualified right to dismiss such new employees." (D.I. 65 at A14) Plaintiff admitted during his deposition that Pepsi officials fired him because they found him in violation of the absentee policy. (D.I. 62, Walker Depo., at A51-52) Indeed, plaintiff's absentee record for the period June 5, 1995-January 13, 1996 indicates that plaintiff was late 34 out of 79 working days and that he had one unexcused absence. (D.I. 72, Absentee Rep., Ex. F1)

Plaintiff offers only a conclusory response to Pepsi's legitimate, nondiscriminatory reasons for firing him. Plaintiff simply claims that his termination was due to racial discrimination on the part of Plant Manager Chominski. (D.I. 62, Walker Depo., at A52) Plaintiff offers no evidence in support of this claim. Moreover, he has pointed to no evidence that would lead a rational fact finder to conclude that Pepsi's stated reasons for firing him were merely pretextual. Indeed, the fact that Pepsi rehired him with full seniority raises the opposite inference. For these reasons, the court shall grant Pepsi summary judgment on this claim.

ii. The First Extra Man Position

In order to state a prima facie case with respect to alleged racial discrimination in Pepsi's decision to rescind the Extra Man position, plaintiff must demonstrate that (1) he is a member of a protected class, (2) that he applied for, was qualified for, and was removed from the position sought, and (3) under circumstances giving rise to an inference of discrimination. *See Stewart v. Rutgers, The State Univ.,* 120 F.3d 426, 432 (3d Cir.1997); *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 (3d Cir.1995).

At the time plaintiff bid for the Extra Man position, he was not "qualified" for it under the bidding procedures of the Collective Bargaining Agreement because he lacked the necessary seniority. The Collective Bargaining Agreement requires that preference be given to bidding employees having seniority within the particular department. (D.I. 65 at A27) The documentary evidence, which plaintiff has not rebutted with admissible evidence,

establishes that Cooney bid for the Extra Man position and that he was the most senior person in the Sales Department who had bid on the slot. Conversely, plaintiff had no seniority in the Sales Department. (D.I. 65, Bid Slip, at A3; McKinnon Aff., at A245 ¶¶ 4-5) Consequently, plaintiff cannot establish a prima facie case of discrimination related to the recision of the Extra Man position.

*13 Assuming, *arguendo,* that plaintiff could establish a prima facie case, Pepsi has rebutted the inference of discrimination by pointing to the Collective Bargaining Agreement's bidding provisions. The Agreement clearly requires that Pepsi award bids to the most senior bidder within a department. Cooney had more seniority than plaintiff in the Sales Department and, therefore, Pepsi had little choice but to award it to him. Having established a legitimate, nondiscriminatory reason for its decision to award the Extra Man position to Cooney, the burden now shifts back to plaintiff to establish pretext. *See Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). Plaintiff can demonstrate pretext by showing " 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact finder could rationally find them 'unworthy of credence." " *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994) (citations omitted)).

To this end, plaintiff contends that his sales supervisor (Joe Burns) orchestrated the recision because of his racial animus toward plaintiff. According to plaintiff, Burns berated him using racially derogatory language and ordered Cooney to submit a grievance seeking plaintiff's Extra Man position. (D.I. 65, Walker Depo., at A56) Other than his own conclusory assertion, there is no evidence that Burns' alleged racial animosity played a role in Pepsi's decision to rescind its award of the position to plaintiff. Even if Burns uttered racial epithets, this fact alone hardly constitutes evidence of an elaborate conspiracy to force plaintiff out of his Extra Man position. Other than his own unsupported opinion, there is no evidence indicating a connection between Burns' alleged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

racial animosity and the filing of Cooney's grievance seeking plaintiff's position. Furthermore, there is no evidence that race played the slightest role in Pepsi's consideration of the merits of that grievance. Plaintiff must come forward with more than his own unsupported beliefs to defeat a motion for summary judgment. *See Liberty Lobby,* 477 U.S. at 256-57 (noting that the plaintiff must come forward with affirmative evidence).

In a further effort to cast doubt on Pepsi's proffered reason for the recision, plaintiff asserts that Cooney was ineligible to bid on the Extra Man position because he was a "new hire" and because he did not wait 180 days after starting his new job in the Sales Department to bid on the Wilmington Extra Man position. These arguments are without merit. First, the Collective Bargaining Agreement does not restrict a new hire's ability to bid on job openings. Second, the Agreement only prohibits successful "bidders" from rebidding "for second, equal, or lesser-rated position[s]" for 180 days. (D.I. 65 at A27) Cooney never bid on his prior Sales Department job. Instead, Pepsi hired him "off the street" under the Collective Bargaining Agreement's new hire procedures to fill a vacancy in the Sales Department. (D.I. 65, McKinnon Aff., at A245 ¶ 5) Thus, he was not a successful "bidder" for that prior Sales position and, therefore, was not constrained by the Collective Bargaining Agreement's 180-day bidding moratorium.

*\*14* In short, plaintiff has not pointed to any competent evidence of pretext. Because he has not produced evidence sufficient to establish a prima facie case or, in the alternative, evidence sufficient to rebut Pepsi's legitimate, nondiscriminatory reasons for rescinding the Extra Man position, Pepsi is due summary judgment on this aspect of plaintiff's race discrimination claim.

iii. The Bottle Line Position, the Second Extra Man Slot, and the Lead Man Position

Plaintiff further premises his race discrimination claim on the denial of several positions at Pepsi's plant. Following the recision of his Extra Man position, plaintiff returned to Pepsi's warehouse and worked at a "route loading position." (D.I. 62, Walker Depo., at 75) Soon after his return, he bid on a Bottle Line position that Pepsi ultimately awarded to Dave Carson. On January 6, 1997, plaintiff bid on another Extra Man position in the Wilmington Sales Department. (D.I. 65 at A5-6) Pepsi denied this bid. Finally, plaintiff claims that Pepsi should have paid him at the "Lead Man" rate from November 1996 until approximately January 1997.

To establish a prima facie case of race discrimination arising out of these denials, plaintiff must establish (1) that he is a member of a protected class, (2) that he applied for, was qualified for, and was denied the position sought, and (3) under circumstances that give rise to an inference of discrimination. *See Stewart,* 120 F.3d at 432; *Waldron,* 56 F.3d at 494.

With respect to the Bottle Line slot, plaintiff cannot establish that he was qualified for that position. The Bottle Line position is subject to the Collective Bargaining Agreement's bidding provisions. Pepsi awarded the position to Carson because he was senior to plaintiff. Although plaintiff disputes this claim, the documentary evidence establishes conclusively that Carson's hiring date preceded plaintiff's by 21 days. (D.I. 65, Employment Records, at A1-2) Furthermore, there is no evidence suggesting that racial discrimination played a role in the rejection of his bid.

Similarly, plaintiff cannot demonstrate that he was qualified for the second Extra Man position. Plaintiff bid for the Extra Man position on January 6, 1997. (D.I. 65, Bid Sheet, at A6) This bid came only several days after Pepsi had awarded him a Pallet Repair position on which plaintiff had bid in late December 1996. (D.I. 65, Bid Awards, at A5) Article XVII of the Collective Bargaining Agreement prohibits successful bidders from bidding for "a second, equal, or lesser-rated position" for 180 calendar days after the bid. (D.I. 65 at A27) Thus, his prior Pallet Repair bid disqualified him from bidding on the Extra Man position.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

(Cite as: 2000 WL 1251906 (D.Del.))

Finally, plaintiff cannot establish that he qualified for Lead Man pay. According to Pepsi, the Lead Man position is awarded by the company without regard to the Collective Bargaining Agreement. It is awarded only to those with demonstrated leadership abilities. (D.I. 65, McKinnon Aff., at A245) Moreover, the Lead Man during the period in question was Edward Fisher, not plaintiff. (D.I. 65, McKinnon Aff ., at A245) Plaintiff has not disputed these assertions with competent evidence, and he has no documentation to support his claim of entitlement to Lead Man pay. His bare assertion of entitlement, without more, is not sufficient to withstand summary judgment.

**\*15** Even if plaintiff could meet his prima facie case with respect to these adverse employment actions, he has failed to rebut Pepsi's legitimate nondiscriminatory reasons for not awarding him the various positions and designations. There is absolutely no evidence that racial animus tainted Pepsi's consideration of plaintiff's bids. Indeed, the Collective Bargaining Agreement afforded Pepsi little flexibility in awarding vacant positions. With respect to plaintiff's alleged entitlement to Lead Man pay, there is no evidence that plaintiff's race played any role in Pepsi's refusal to accord him Lead Man pay. Accordingly, the court shall grant Pepsi's motion for summary judgment as it relates to these allegations.

iv. Plaintiff's January 1997 Discharge

In order to state a prima facie case of discrimination arising out of his discharge, plaintiff must show (1) that he is a member of a protected class, (2) that he was fired, and (3) under circumstances that give rise to an inference of discrimination. *See Stewart,* 120 F.3d at 432; *Waldron,* 56 F.3d at 494. Although plaintiff satisfies the first two elements, he has offered no evidence to satisfy the third. The record reveals that Pepsi terminated plaintiff because he violated Pepsi's Absentee Policy. Other than plaintiff's unsupported allegations, plaintiff has offered no admissible evidence that racism played a role in his discharge.

Plaintiff also is unable to rebut Pepsi's legitimate, nondiscriminatory reasons for firing him. By plaintiff's own admission, he violated the Absentee Policy's call-in procedures. (D.I. 62, Walker Depo., at A138, A159-60) Plaintiff claims that he did not call in his absences for the week of June 23, 1997 because his name was not on that week's work schedule. Pepsi has submitted a properly authenticated work sheet that contradicts this assertion. (D.I. 65, Work Schedule, at A7; McKinnon Aff., at A246 ¶ 10) Further, the court cannot countenance plaintiff's unsupported allegation that Pepsi falsified this work sheet. Because plaintiff has failed to rebut Pepsi's legitimate reasons for firing him, the court shall grant Pepsi's motion for summary judgment as it relates to plaintiff's race discrimination claim.

2. Hostile Work Environment

Plaintiff also complains of pervasive racial harassment at Pepsi's Wilmington facility. At issue is whether plaintiff has adduced sufficient facts to withstand Pepsi's motion for summary judgment. To state a Title VII claim premised on a hostile work environment, a plaintiff must show

(1) that he ... suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.

*Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996). Plaintiff has not met this standard.

**\*16** As noted, plaintiff has not established any racial discrimination related to his job bids or his eventual termination. The only blatantly racist incident occurred when Joe Burns allegedly used racially offensive language in reference to plaintiff. (D.I. 65, Walker Depo., at A108-112, A114-118) Judging by plaintiff's deposition and by the numerous grievances he submitted, Burns' epithet was the only incident during his employment where Burns (or any other Pepsi employee, for that matter)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
Page 15

**(Cite as: 2000 WL 1251906 (D.Del.))**

used racially derogatory language. One-time utterances of racial epithets simply do not rise to the level of racial harassment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (citing *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971)). The alleged racially offensive conduct must be pervasive and regular, not merely episodic as in the present case. *See id.* at 788. Moreover, the allegedly harassing conduct noted by plaintiff amounts, at worst, to rudeness. For instance, plaintiff alleged in his deposition that Plant Manager Chominski called him a "scam artist." Although Chominski's comment was rude, Title VII does not establish a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998).

Because plaintiff has failed to produce evidence of a regular and pervasive racial hostility, Pepsi is entitled to summary judgment on the hostile work environment claim.

3. Plaintiff's Retaliation Claim

It is unclear whether plaintiff alleges retaliation arising under Title VII or under the ADA or both. The court shall err on the side of liberality and construe plaintiff's complaint to include retaliation arising under both statutes. At this point, the court shall confine its analysis to plaintiff's Title VII retaliation claim.

In his complaint plaintiff claims that Pepsi fired him in July 1997 in retaliation for his April 28, 1997 EEOC charge against the company. (D.I. 2 ¶ 40) In his summary judgment briefs, he also argues that Pepsi fired him in retaliation for his numerous grievances. The court will assess both claims. To establish a prima facie claim of retaliation under Title VII, plaintiff must prove that:
    (1) [he] engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against [him]; (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.
*Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1299 (3d Cir.1997).

With respect to his EEOC charge, the EEOC inexplicably sent its notice of plaintiff's charge to a Greg Horton at Pepsi's Philadelphia bottling facility. (D.I. 65, EEOC Notice, at A70) Horton was the Human Resources Director at Pepsi's Philadelphia facility. When the EEOC sent the notice, however, Horton had transferred to a Pepsi facility in Denver, Colorado. (D.I. 65, McKinnon Aff., at A245-46 ¶ 7) Because of this error, the Wilmington Human Resources Director, Alison McKinnon, did not receive the notice until "late July or early August 1997." (D.I. 65, McKinnon Aff., at A245 ¶ 7) Consequently, "[o]n July 10, 1997, when Wilmington management made the decision to terminate [plaintiff], [they] did not know that he had filed a charge of discrimination." (D.I. 65, McKinnon Aff., at A246 ¶ 7) Plaintiff has not rebutted these facts with admissible evidence. Consequently, there is no dispute that Pepsi management did not know of plaintiff's EEOC charge until well after it had fired him. To the extent that plaintiff's retaliation claim rests on his EEOC charge, it must fail.

*17 With respect to his grievances, not a single one alleged racial harassment. Although he complained bitterly of numerous injustices, none of his grievances mentioned racial harassment or discrimination. For this reason, the grievances were not protected activity under Title VII. *See Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 701-02 (3d Cir.1995) (finding that letter to employer expressing general dissatisfaction, but not specifically age discrimination, was not protected conduct for purposes of establishing prima facie case of retaliation). Accordingly, the court shall grant Pepsi's motion for summary judgment on plaintiff's Title VII retaliation claim.

B. Plaintiff's ADA Claims

Plaintiff's complaint also alleges that Pepsi discriminated against him because he was disabled (or because Pepsi regarded him as disabled), that Pepsi failed to accommodate his disabilities, and that Pepsi retaliated against him for filing grievances complaining of Pepsi's disability discrimination. The court shall evaluate each of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

these allegations in turn.

1. Plaintiff's Disability Discrimination Claim

The ADA prohibits an employer from discriminating against a "qualified individual" with a disability. *See* 42 U.S.C. § 12112(a) (1994). In order to state a prima facie case under the ADA, the plaintiff must establish that he (1) has a disability, (2) is otherwise qualified to perform the essential functions of the job, with or without accommodations by the employer, and (3) has suffered an adverse employment action because of the disability. *See Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 142 (3d Cir.1998).

At issue is whether plaintiff has a disability. The ADA defines "disability" as:
   (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
   (B) a record of such impairment; or
   (C) being regarded as having such an impairment.
42 U.S.C. § 12102(2). The EEOC regulations [FN19] interpreting the ADA define both "substantially limited" and "major life activities." The regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working ." 29 C.F.R. § 1630.2(i) (1997). In determining whether a plaintiff is substantially limited in one or more of those activities, the regulations advise courts to consider the nature and severity of the impairment, the duration of the impairment, and the permanent, long-term impact resulting from the impairment. *Id.* § 1630.2(j)(2).

> FN19. Regulations issued by the implementing federal agency are entitled to substantial deference from courts. *See Deane,* 142 F.3d at 143 n. 4 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984)).

Plaintiff claims to suffer from the following disabilities: eczema, sinusitis, anxiety and depression, lumbosacral strain, and fibromyalgia. With respect to eczema and sinusitis, these simply do not rise to level of physical impairments under the ADA. Plaintiff's alleged depression, anxiety, lumbosacral strain, and fibromyalgia, however, constitute "impairments" under the ADA. The court must determine whether these impairments substantially limit plaintiff in one or more major life activities.

**\*18** Plaintiff appears to argue that his impairments limit his ability to lift, walk, and work. Plaintiff has introduced absolutely no medical testimony in support of these claims. Instead, he relies entirely on his own assertions and various written diagnoses of his doctors.

With respect to the major life activity of lifting, plaintiff offers several diagnoses of thoracic strain and fibromyalgia. One diagnosis imposes a ten pound lifting restriction on plaintiff. (D.I. 72, 03/06/97 Report, Ex. B) Another report imposes a fifteen pound lifting restriction, while the most recent diagnosis imposes no restrictions on plaintiff. (D.I. 72, 5/15/97 Report; 5/21/97 Report, Ex. B) The Third Circuit has held that lifting limitations similar to plaintiff's do not substantially limit an individual's ability to lift. *See, e.g., Marinelli v. City of Erie,* 216 F.3d 354 (3d Cir.2000) (holding that ten pound lifting restriction did not constitute a disability). Accordingly, plaintiff's lifting restrictions (to the extent that he has any) do not substantially limit his ability to lift.

Plaintiff also claims that his physical impairments substantially limit his ability to walk. Again, there is no medical testimony to support this claim. The EEOC regulations define a person substantially limited in the major life activity of walking as one who "can only walk for very brief periods of time." *See* 29 C.F .R. app. § 1630.2(j). Plaintiff's medical records indicate that he can walk anywhere from up to one hour at a time to a total of four hours in a given day. (D.I. 72, 5/25/98 Medical Report, Ex. B) Plaintiff presented no evidence that he requires a cane or crutches to walk. The Third Circuit has recognized that comparatively mild walking restrictions (such as those imposed on plaintiff) are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 2000 WL 1251906 (D.Del.))**

not disabilities. *See Kelly v. Drexel Univ.,* 94 F.3d 102, 106-08 (3d Cir.1996). Because plaintiff's walking restrictions are comparatively mild, they do not substantially limit him in the major life activity of walking.

Finally, plaintiff argues that his physical and mental impairments render him disabled in the major life activity of working. No medical testimony exists to support this claim. Furthermore, the diagnostic reports offered by plaintiff only place broad restrictions on his ability to work. The medical reports do not specifically exclude him from any class of jobs. To be substantially limited from working, an individual must be unable "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630(j)(3)(i). Thus, to avoid summary judgment plaintiff must present more than mere general restrictions on his ability to work. He must present evidence of the class of jobs from which he is disqualified. The Third Circuit recently ruled on this very point. In *Marinelli v. City of Erie,* the Third Circuit held that the plaintiff could not avoid judgment as a matter of law under the ADA where he offered only evidence of a physician's general restrictions on his work (such as "light duty") rather than evidence of the class of jobs from which the plaintiff was disqualified. *See* 216 F.3d at 364-65. Because plaintiff has not submitted such evidence, he cannot defeat Pepsi's motion for summary judgment. [FN20]

> FN20. Because plaintiff cannot establish that he is a "qualified individual with a disability," he also cannot succeed on his claim that Pepsi failed to accommodate his disabilities. The ADA renders unlawful the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee...." 42 U.S.C. § 12112(b)(5)(A) (1994) (emphasis added).

2. Plaintiff's "Regarded As" Disability Claim

**\*19** Plaintiff also argues that Pepsi officials discriminated against him because they regarded him as disabled. *See* 42 U.S.C. § 12102(2)(C). The regulations consider an individual "regarded as" disabled if he or she:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
(3) Has none of the impairments defined in this section but is treated ... as having a substantially limiting impairment.

29 C.F.R. § 1630.2(1). As the United States Supreme Court recently noted, an individual falls within the definition of "regarded as" disabled if (1) an employer mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *See Sutton v. United Airlines, Inc.,* 119 S.Ct. 2139, 2149-50 (1999) (explaining that an employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting").

In support of his "regarded as" claim, plaintiff first points to a single, isolated comment by Plant Manager Chominski who allegedly implied that plaintiff was not physically "100%." (D.I. 62, Walker Depo., at A106) Second, plaintiff argues that Pepsi regarded him as disabled because they ordered him to appear for an independent medical examination so that his supervisors could evaluate his claims of disability. At most, these allegations establish that his supervisors were aware of his back pain complaints and that they attempted to secure independent medical verification of the genuineness of these complaints. Mere awareness of an employee's alleged physical impairments, however, is insufficient to demonstrate that Pepsi regarded plaintiff as disabled. *See Kelly,* 94 F.3d at 109.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as: 2000 WL 1251906 (D.Del.))

There is no evidence that Pepsi officials regarded him as having a disability that prevented him from performing his work. Indeed, they continued to schedule plaintiff for work and only terminated him after his repeated, unexcused absences and failures to "call in." Because there is no evidence that Pepsi officials regarded him as disabled, the court shall grant Pepsi's motion for summary judgment on plaintiff's "regarded as" claim.

3. Plaintiff's ADA Retaliation Claim

Lastly, plaintiff claims that Pepsi retaliated against him for filing grievances with the Teamsters about alleged disability discrimination. *See* 42 U.S.C. § 12203(a) (prohibiting discrimination against an employee when he "has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation ... under this Act"). There is no dispute that his grievances constituted protected activity under the ADA or that he suffered an adverse employment action (his dismissal) after filing grievances. Like his prior Title VII retaliation claim, his ADA retaliation claim also falters on the causation prong of his prima facie case.

*20 To state a prima facie case of retaliation, plaintiff must demonstrate "a causal connection between [his] participation in the protected activity and the adverse employment action." *Robinson,* 120 F.3d at 1299. As evidence of causation, plaintiff relies only on the temporal proximity of his July 7th termination to the filing of his disability-related grievances on June 20th. (D.I. 62, Grievances, at A392-96) As the Third Circuit has explained, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Id* . at 1302. Plaintiff has offered no other evidence that his grievances prompted Pepsi officials to fire him. Thus, without more, plaintiff cannot state a prima facie case of retaliation. Even if he could establish a prima facie case, the record is devoid of pretext to rebut Pepsi nondiscriminatory reasons for firing him. Accordingly, the court shall grant summary

judgment on plaintiff's ADA retaliation claim.

C. Plaintiff's Breach of Contract Claim

Finally, plaintiff claims that Pepsi breached the Collective Bargaining Agreement. As noted above, this claim arises under § 301 of the LMRA. *See* 29 U.S.C. § 185(c) (providing for federal jurisdiction over breach of collective bargaining contracts). In a typical § 301 action, the employee sues the employer for breach of the collective bargaining agreement and the union for breach of its duty of fair representation. *See Vadino,* 903 F.2d at 260. Such suits require the plaintiff to prove both the violation of the collective bargaining agreement and the breach of the union's duty of fair representation. *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6,* 493 U.S. 67, 83 (1989) (noting that "an allegation that the union had breached its duty of fair representation [is] a necessary component of the § 301 claim against the employer"); *Felice v. Sever,* 985 F.2d 1221, 1226 (3d Cir.1993) (explaining that in a § 301 suit "the plaintiff will have to prove that the employer breached the collective bargaining agreement in order to prevail on the breach of duty of fair representation claim against the union and vice versa").

In this case, the court has ruled that plaintiff's claims against the Teamsters are time-barred or, in the alternative, without evidentiary support. Therefore, plaintiff's § 301 claim fails because he cannot make the necessary showing that the Teamsters violated their duty of fair representation. Even if he could, plaintiff cannot show that Pepsi violated the Collective Bargaining Agreement. There is simply no evidence indicating that Pepsi violated the Agreement with respect to plaintiff. In fact, the evidence demonstrates that Pepsi rigidly followed the Agreement's provisions regarding job bidding and award procedures. Nor is there any evidence indicating that Pepsi violated the Agreement when it terminated plaintiff. Article XI of the Agreement specifically provides that Pepsi "may discharge employees for any reasonable cause." (D.I. 65 at A22) Plaintiff's repeated violations of the Attendance Policy's call-in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

**(Cite as: 2000 WL 1251906 (D.Del.))**

provisions provided Pepsi with reasonable cause.

**\*21** For each of these reasons, then, the court shall grant summary judgment on plaintiff's LMRA claim.

VI. CONCLUSION

For the aforementioned reasons, the court shall grant the motions for summary judgment filed by the Teamsters and Pepsi. For the same reasons, it shall deny plaintiff's motion for summary judgment. Plaintiff also filed a "Motion to Enter Documents into Evidence," which amounts to nothing more than a list of names of potential trial witnesses. (D.I.53) Plaintiff never deposed any of these witnesses or procured affidavits from them. Accordingly, the court shall dismiss this motion as moot. An appropriate order shall issue.

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.